This search warrant package has been reviewed and approved by the undersigned AUSA

Digitally signed by JASON SCHEFF
Date: 2026.02.25 13:32:04 -05'00'

_____
Jason M. Scheff
Assistant United States Attorney

CLERKS OFFICE
US DISTRICT COURT
AT CHARLOTTESVILLE, VA
FILED
2/26/2026

LAURA A. AUSTIN, CLERK
BY: **s/J. Lopez**
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE  DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE FACEBOOK ACCOUNT OF DANIA ORELLANA-GAMEZ (FACEBOOK TARGET NUMBER 61558122382898) THAT IS STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No.   3:26MJ12 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Benjamin Thorn, being first duly sworn, hereby depose and state as follows:

## I.    INTRODUCTION

### A.  Purpose of Affidavit

1.    I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., an electronic communications service and/or remote computing service provider headquartered at 1 Meta Way, Menlo Park, California 94025.

2.    The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18

1

U.S.C. § 2703(a), (b)(1)(A), and (c)(1)(A) to require Meta Platforms, Inc., to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### B.  Agent Background and Experience

3.    I am a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI), currently assigned to Harrisonburg, Virginia, and have been so employed since June 2023.

4.    In my current capacity as a Special Agent, I am responsible for investigating various types of criminal activity, including witness tampering and obstruction of justice.  My training includes basic, advanced, and on-the-job training in this investigative area, among others. I am familiar with procedures for obtaining and executing federal search warrants and I have led and participated in the execution of numerous search and arrest warrants related to obstruction and interference offenses, child exploitation, firearms and narcotics violations, money laundering, and fraud.

5.    I am a graduate of the Federal Law Enforcement Training Center (FLETC) Criminal Investigator Training Program (CITP), and Homeland Security Investigations Special Agent Training (HSISAT) in Glynco, Georgia.  During training I received general and specific classroom instruction, and practical exercises involving the Fourth Amendment search and seizures.

6.    Prior to my tenure as a Special Agent with HSI, I was previously employed by the West Virginia State Police from 2013 to 2023. And I was previously employed by the Cumberland

Township Police Department and East Washington Boro Police Department in Southwestern Pennsylvania, between 2012 and 2013.

7.      I also hold a Bachelor of Science in Criminal Justice, with a focus on Law and Justice, from California University of Pennsylvania and a Municipal Police Certification from Westmoreland County Community College Police Academy.

### C. Sources of Information

8.      Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included details of every aspect of, or each and every fact known to me concerning, this investigation. I make this affidavit based on personal knowledge and information received from other law enforcement officers and/or agents. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer or witness who may have had either direct or hearsay knowledge of that statement and to whom I or others have spoken, or whose reports I have read and reviewed. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe Dania ORELLANA has violated Title 18, United States Code, Section 1512(b)(1) (Tampering with a witness, victim, or an informant).  There is also probable cause to search the information described in Attachment A for the evidence, instrumentalities, contraband, and fruits of the criminal activity further described in Attachment B.

### II.      TARGET OFFENSE

10.      18 U.S.C. § 1512(b)(1) prohibits an individual from "knowingly us[ing] intimidation, threaten[ing], or corruptly persuad[ing] another person, or attempt[ing] to do so, or

3

engag[ing] in misleading conduct toward another person, with intent to . . . influence, delay, or prevent the testimony of any person in an official proceeding."

### III.    JURISDICTION

11.    This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. § 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

### IV.    PROBABLE CAUSE

12.    On September 16, 2025, the Honorable Joel C. Hoppe found probable cause that Bryan Sixto Arias-Chicas had committed a violation of 18 U.S.C. § 2251(a) in relation to the sexual assault of a 16-year-old girl (MV1) that had occurred in Charlottesville and Albemarle County in May 2025. Specifically, law enforcement had been able to determine that Arias-Chicas had filmed himself having sex with MV1 and had taken several photos and videos of MV1 that displayed a minor engaging in sexually explicit conduct. These photos and videos were located on Arias-Chicas's cell phone when he was arrested.

13.    On or about October 3, 2025, Arias-Chicas was taken into federal custody on these charges and has remained in federal custody.

14.    On December 10, 2025, a grand jury sitting in the Western District of Virginia returned an indictment charging Gustavo Quintero with various crimes in relation to his contact with MV1 in the aftermath of the May sexual assault.

15.    Late at night on or about February 10, 2026, MV1 (who is now 17) reported to the U.S. Attorney's Office and to law enforcement that she had received threats regarding the information that she had provided to law enforcement regarding the May sexual assault.

4

16.     On or about February 11, 2026, I spoke with MV1 who advised that, on Tuesday, February 10, 2026, around 9:30pm, she was at her mother's house, located within the Western District of Virginia, when she received a Facebook friend request from Dania ORELLANA. MV1 accepted the friend request.

17.     Law enforcement databases have since revealed that ORELLANA has a number of addresses within the Charlottesville area and is believed to live at one of those addresses, all of which are located within the Western District of Virginia.

18.     MV1 stated she looked at ORELLANA's profile and observed pictures of her with Arias-Chicas. Based on this information, it appeared to MV1 that ORELLANA was the girlfriend of Arias-Chicas.

19.     MV1 and ORELLANA then proceeded to have a conversation via Facebook Messenger in which ORELLANA sent harassing and threatening messages to MV1. Orellana said: *"Hey bitch, why are you accusing Bryan of raping you when you gave him and other men your pussy and you're accusing him like that, you bitch?"*

20.     ORELLANA continued on to say to MV1: *"I hope they accuse him of rape because we have the videos, bitch, and if they do, we're going to upload them everywhere so everyone can see you, you bitch, because you gave in of your own free will, nobody forced you, because there are witnesses, it depends on you, bitch."* In this statement, ORELLANA appears to imply she is in possession of CSAM videos of MV1 and threatens to post them "everywhere."

21.     ORELLANA then made a threat to MV1 if she were to testify, stating: *"There are photos and videos that show you were aware of having sex, that's why I told you there's proof, and you're going to get even more judged because it's you in that video.  It's better if you keep quiet because you're going to suffer harassment for being raped, according to you and your*

5

*family."* I understand ORELLANA's statement "It's better if you keep quiet…" to imply that MV1 should not testify against Arias-Chicas and should not continue to cooperate with law enforcement.

22.    ORELLANA further explained to MV1 that she should keep quiet by saying *"And he told you there are videos because I saw them and that's why he told you it's in your best interest to stay quiet."*

23.    ORELLANA again threatened to post the videos of MV1 *"I can upload all those videos and put your name on them."*

24.    MV1 was concerned about the messages and believed ORELLANA was attempting to scare her into not testifying in court.

25.    The conversation between MV1 and ORELLANA is very threatening in nature, and it appears that ORELLANA is aware of the CSAM videos that had been recorded by Arias-Chicas and even claimed to have seen them. Additionally, it seems possible that ORELLANA possesses copies of these videos on her devices (or has access to copies of these videos) based on her repeated threats to upload the videos.

26.    I was able to locate a Facebook profile for Dania ORELLANA, which had pictures of ORELLANA and Arias-Chicas together.  The Facebook profile dania.orellana.997092 is suspected to belong to ORELLANA.

27.    I received documentation related to ORELLANA's profile in response to legal process served on Meta (Facebook).  This information revealed that the Facebook target number for ORELLANA's Facebook account is 61558122382898 and that the phone number associated with her account is 434-257-8466.

28.    ORELLANA has utilized this phone number to contact Arias-Chicas while he has been in custody.

## V.    BACKGROUND CONCERNING FACEBOOK[1]

29.    Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.   Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

30.    Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.   Each Facebook user is assigned a user identification number and can choose a username.

31.    Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

32.    Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

33.    Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

34.    Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

35.    Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats.

Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

36.    If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

37.    Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

38.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

39.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

40.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

41.    In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

42.    Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

43.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

44.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

45.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged

10

photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

46.    Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## VI.    INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

47.    I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. § 2703(a), (b)(1)(A) and (c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the

11

content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

48.     In February 2026, in the Western District of Virginia, ORELLANA tried, via Facebook Messenger, to intimidate MV1 and to prevent her from testifying against Arias-Chicas, who is currently incarcerated on pending federal charges.  There is probable cause to believe that ORELLANA sent Facebook messages and made overt threats in an effort to tamper with MV1, a potential witness against Arias-Chicas.  I believe there is probable cause that ORELLANA's Facebook account will contain evidence of this federal offense.

49.     Based on the foregoing, I request that the Court issue the proposed search warrant.

50.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Meta.  Because the warrant will be served on Meta, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## OATH

The information in this affidavit is true to the best of my knowledge and belief.

*/s/ Benjamin Thorn*
Benjamin Thorn
Special Agent
Homeland Security Investigations

Attested to in accordance with the requirements of Fed. R. Crim. P. 4.1 via telephone on this 26th of February 2026.

JOEL C. HOPPE
UNITED STATES MAGISTRATE JUDGE

12